UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DARRELL FRIEDLAND,<br>    *Plaintiff*,<br>     *v.*<br>YADIRA OTERO, *et al.*,<br>    *Defendants*. | Civil No. 3:11cv606 (JBA)<br><br>March 25, 2014 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Darrell Friedland, was incarcerated at Corrigan-Radgowski Correctional Institution, in Uncasville, Connecticut,[1] when he commenced this civil rights action pro se pursuant to 42 U.S.C. § 1983 against Lieutenant Yadira Otero, Counselor John Kay, District Administrator Wayne Choinski and Director of Offender Classification and Population Management Fred Levesque (collectively, "Defendants"). Plaintiff alleges multiple violations of his Fourteenth Amendment right to due process arising from his security designation and the discipline to which he was subjected after an alleged escape attempt. Defendants have filed an amended motion [Doc. # 39] for summary judgment, arguing that Plaintiff has failed to establish a legal or factual basis for his claims, and that in any event, they are entitled to qualified immunity on each of his claims. For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1] Plaintiff is currently confined at the Massachusetts Correctional Institution in Norfolk, Massachusetts.

I.       **Background**[2]

Plaintiff previously served a prison sentence in Ohio. After he was released on parole, the Ohio parole officers transferred Plaintiff's parole to Connecticut.   On December 30, 2005, the Connecticut Board of Pardons and Paroles began supervising Plaintiff's parole.

On August 4, 2006, a Connecticut parole officer remanded Friedland to the custody of the Connecticut Department of Correction on a violation of the terms of his parole in connection with the Vernon Police Department's investigation of allegations that Plaintiff had been involved in an assault with a dangerous weapon in July 2006. Department of Correction officials remanded Plaintiff to Hartford Correctional Center at that time.   Vernon Police Officers subsequently arrested Plaintiff in September 2006 on charges of assault in the second degree, reckless endangerment in the first degree, and carrying a dangerous weapon.

On August 10, 2006, prison officials at Hartford Correctional Center issued a disciplinary ticket charging Friedland with a Security Risk Group affiliation based on his membership in the Aryan Brotherhood and also notified Plaintiff that he would have a classification hearing to determine if he should be designated as a Security Risk Group Member or Security Risk Group Safety Threat Member.

---

[2] This summary of the undisputed facts is taken from Defendants' Local Rule 56(a)1 Statements [Doc. ## 20-18, 40-1] along with the attached exhibits, Plaintiff's Local Rule 56(a)2 Statement [Doc. # 50-2], and Plaintiff's Affidavit [Doc. # 25-3].

On August 10, 2006, Plaintiff participated in a classification hearing.  At the conclusion of the hearing, prison officials informed Plaintiff in writing that he had been designated as a Security Risk Group Member of the Aryan Brotherhood and that he had been placed on punitive segregation status.  On September 26, 2006, prison officials transferred Plaintiff to Northern Correctional Institution in Somers, Connecticut ("Northern") and placed him in a Close Monitoring Unit.  At the time, Northern was a designated facility for managing inmates who had been designated as Security Risk Group Members.

On April 16, 2008, two State of Connecticut Judicial Marshals transported Friedland from Northern to the Connecticut Superior Court for the Judicial District of Rockville in connection with the assault, reckless endangerment, and weapon possession charges pending against him.  *See State v. Friedland*, Docket Nos. T19R-CR06-088011-S, T19R-CR06-0088012-S.  At this court appearance, Plaintiff pleaded guilty to two counts of assault in the second degree in violation of Connecticut General Statutes § 53a-60, one count of reckless endangerment in the first degree Connecticut General Statutes § 53a-63 and one count of carrying a dangerous weapon in violation of Connecticut General Statutes § 53-206.[3]  He was not sentenced that day.

The van that transported Plaintiff back from Rockville Superior Court, driven by two State of Connecticut Judicial Marshals had the driver and front passenger area

---

[3] Information pertaining to these criminal cases may be found by searching under Plaintiff's last name or case number at http://www.jud.ct.gov/crdockets/SearchByDef Disp.aspx.

3

divided from the back of the van by a partition, and the back of the van was divided in half by a partition.  Plaintiff was sitting on one side of this partition with one inmate from Osborn Correctional Institution, one inmate from Cheshire Correctional Institution and one inmate from MacDougall-Walker Correctional Institution ("MacDougall-Walker").  There were seven inmates from Hartford Correctional Center on the other side of the partition.

During the ride to MacDougall-Walker, some of the inmates in the van argued about a baseball cap worn by an inmate sitting across the partition from Friedland.  One or more of the inmates covered the van's cameras used to monitor what was happening in the rear of the van.  When one of the inmates on the other side of the partition called Plaintiff a name, Plaintiff kicked out part of the partition for access to the other side of the van.[4]  At that point, at least one of the cameras in the van was uncovered.  Plaintiff then moved to the other side of the van and spoke with the inmate who had called him a name.  The Judicial Marshals were able to hear what the inmates were saying during the entire incident.

The Judicial Marshals radioed their supervisor about the incident, who advised them to remain in the area until the Connecticut State Police arrived at their location.  After State Police Officers arrived approximately twenty minutes later, the officers and the Marshals' supervisor decided to keep the inmates in the van and to transport them to

---

[4] Plaintiff admits in his affidavit that he kicked out the partition, but denies that his actions were part of an attempt to escape.  (*See* Pl.'s Aff. ¶¶ 18, 20.)

MacDougall-Walker.   Upon arrival, MacDougall-Walker officials unloaded all of the other inmates, and Plaintiff was then transported to Northern.

On April 17, 2008, a prison official issued Friedland a disciplinary report charging him with the Class A Offense of Attempted Escape related to the April 16, 2008 van incident.   On May 14, 2008, Defendant Otero presided over the hearing held on the disciplinary charge, finding Plaintiff guilty of attempted escape and imposing sanctions. Defendant Choinski upheld the disciplinary finding on appeal.   On May 13, 2008, correctional officials at Northern issued an order that Plaintiff be placed on High Security Status.  Plaintiff was not afforded a hearing prior to this High Security Status designation.

On August 15, 2008, prison officials transported Friedland back to Rockville Superior Court for sentencing on the charges to which he had pled guilty on April 16, 2008.  During that court proceeding, Plaintiff was sentenced to a total effective sentence of five years' imprisonment, followed by two years of special parole.  On March 4, 2009, Plaintiff appeared in state court pursuant to his guilty pleas to one count of disorderly conduct and one count of criminal mischief in connection with his involvement in the incident in the prison van on April 16, 2008.  *See State v. Friedland*, Docket No. T19R-CR08-0092492-S.  He was sentenced to thirty days' imprisonment on both counts to be served concurrently to each other and to his sentence on the Vernon charges, and was ordered to pay restitution in the amount of $585.00 for destruction to the prison van.

## II.    Discussion[5]

Plaintiff alleges that Defendants violated his Fourteenth Amendment right to due in several respects in connection with his discipline arising the alleged escape attempt from the prison van.  Specifically, Plaintiff claims that:  (1) "[t]he 'description of violation' on the Disciplinary Report was too vague and/or conclusory to provide meaningful notice;" (2) "[t]he advocate failed to investigate and to help [] Plaintiff prepare a defense when [] Plaintiff was unable to do so on his own; (3) "[t]he guilty finding [on the attempted escape charge] was not supported by some evidence;" (4) "[t]he evidence used to support the charge [of attempted escape] was not disclosed to [] Plaintiff;" (5) "Plaintiff was not afforded a hearing of any type before being placed on High Security;" and (6) "[b]ecause he was not in [Department of Correction] custody at the time of the incident

---

[5] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).  Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

on the van, consistent with due process the [Department of Correction] could not sanction him for the incident." [6]  (*See* 2d Am. Compl. [Doc. # 35] ¶ 45.)   Friedland seeks injunctive relief requiring Defendants to remove him from High Security Status and to expunge the April 17, 2008 disciplinary report from his record, as well as compensatory damages.  Defendants move for summary judgment on five grounds.  They argue that: (1) Plaintiff has no liberty interest in his classification to High Security Status; (2) they did not deny him due process in connection with the disciplinary charge of attempted escape; (3) Plaintiff has not alleged the personal involvement of Defendants Choinski and Levesque in the deprivation of his constitutional rights and thus they are not proper defendants in this action; (4) Plaintiff's claims for injunctive relief are moot; and (5) Defendants are entitled to qualified immunity on each of Plaintiff's claims.

As a preliminary matter, for the purposes of this action, the parties do not dispute that Plaintiff was a pretrial detainee from at least April 16, 2008 through August 15, 2008, when he was sentenced to five years of imprisonment on the Vernon criminal charges. Because all of the relevant events in this case, such as the incident in the prison van, Friedland's disciplinary hearing, and his High Security designation, took place during this time period, Friedland's due process claims will be evaluated by the standards governing pretrial detainees.

The claims of a pretrial detainee confined in a state correctional facility are reviewed under the Due Process Clause of the Fourteenth Amendment.  *See Bell v.*

---

[6] Defendants failed to address this claim in their amended motion for summary judgment.

*Wolfish*, 441 U.S. 520, 535 & n.16 (1979).  Because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," the Fourteenth Amendment dictates that he or she may not be punished in any manner-neither cruelly and unusually nor otherwise.  *Id.* at 536–37.  To state a claim for violation of procedural due process, a plaintiff must demonstrate that he "possessed a protected liberty or property interest, and that . . . [the defendants] deprived [him] of that interest without due process of law." *McMenemy v. City of Rochester*, 241 F.3d 279, 285–86 (2d Cir. 2001) (citation omitted).  "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).

A pretrial detainee has a liberty interest under the Due Process Clause in avoiding conditions of pretrial confinement that amount to punishment. *See Bell*, 441 U.S. at 535–37.  "Not every disability imposed during pretrial detention," however, "amounts to 'punishment' in the constitutional sense." *Id.* at 537.  In the absence of an allegation that "the defendant verbally expressed an intent to punish, punitive intent may be inferred from the nature of the conditions or restraints." *Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 338 (E.D.N.Y. 2013).  A court may consider "'whether an alternative purpose to which [the sanction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).  Thus, "if a particular condition or restriction of pretrial detention is reasonably related to a

8

legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.   "[E]nsuring a detainee's presence at trial," maintaining security and order within the prison facility and operating the facility in a manageable fashion are all examples of valid governmental objectives that could justify the imposition of restrictive conditions of confinement on pretrial detainees. *See id.* at 540.   Courts "ordinarily defer to [the] expert judgment" of prison officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response" to administrative considerations. *Id.* at 540 n.23.   Even if restrictions placed on a pretrial detainee are not punitive in violation of a protected liberty interest under the Fourteenth Amendment, a court must also inquire whether the state by "statute or regulation prescribes mandatory procedures that . . . create a liberty interest." *Covino v. Vermont Dep't Corrections*, 933 F.2d 128, 129 (2d Cir. 1991) (citing *Hewitt*, 459 U.S. 460).   If the pretrial detainee is able to establish a liberty interest either under the Fourteenth Amendment itself or under state law, the court must then determine what process is due the detainee.

In determining the type of process due a pretrial detainee, courts have focused on the purpose and need for the restraint on the protected liberty interest.   The Court of Appeals for the Second Circuit has held that a pretrial detainee who has been subjected to disciplinary sanctions or punitive restraints is entitled to the due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974).   *See Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (affirming district court's application of *Wolff* to pretrial detainees and noting that the required *Wolff* procedures were applicable to a restraint on the detainee's

liberty that was "imposed for disciplinary reasons" or constituted punishment due to its painful and injurious nature). Thus, if the purpose of the restraint on liberty is punitive in nature, the procedural protections set forth in *Wolff* apply. However, if the purpose of the restraint on liberty is administrative, then the minimal procedures outlined in *Hewitt v. Helms*, 459 U.S. 460 (1983) are all that is required. *See Benjamin*, 264 F.3d at 190. Administrative purposes include restraints that are employed to achieve a legitimate governmental interest in protecting the safety of the individual, prison staff or the general prison population.

### A.    Procedural Due Process—Disciplinary Charge

On May 14, 2008, following the van incident, Defendant Otero found Plaintiff guilty of attempted escape and sanctioned him to fifteen days of punitive segregation, ninety days' loss of telephone privileges and ninety days' loss of commissary privileges. The parties do not dispute that these sanctions were punitive in nature, and thus Plaintiff was entitled to the due process protections set forth in *Wolff*. Pursuant to *Wolff*, a pretrial detainee charged with a disciplinary violation is entitled to: a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer or committee as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action. *See Wolff*, 418 U.S. at 564–66. While a pretrial detainee has no right to retained or appointed counsel at a disciplinary

hearing, in some circumstances, he or she may be entitled to the appointment of an advocate or assistance from a fellow inmate.  *Id.* at 570.  Plaintiff claims that Defendants Otero, Kay, and Choinski violated his procedural due process rights in connection with the discipline imposed for his attempted escape in that the notice of disciplinary charge was vague; Plaintiff's advocate did not provide effective assistance at the hearing; Defendants failed to disclose to Plaintiff the evidence against him; and Defendants' finding of guilt was not supported by any evidence.

### 1.   *Notice of Disciplinary Charge*

Plaintiff does not dispute that he received a disciplinary report in connection with the attempted escape charge more than twenty-four hours before his disciplinary hearing, as required by *Wolff.*   Rather, Plaintiff argues that the report was too vague to provide him with meaningful notice of the charge against him.  In *Taylor v. Rodriguez*, 238 F.3d 188 (2d Cir. 2001), the Second Circuit, considering the minimum requirements for notice to an inmate in the context of a disciplinary or administrative segregation hearing, held that notice is more than a "mere formality;" it must "be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report."  *Id.* at 192–93 (quoting *McKinnon v. Patterson*, 568 F.2d 930, 940 n. 11 (2d Cir. 1977)).

The April 17, 2008 disciplinary report issued to Friedland by Lieutenant Bernard Loubier charged Plaintiff with the Class A Offense of Attempted Escape.[7]  The description of the violation reads as follows:

> On Thursday, April 17, 2008, following additional investigation conducted by the Security Division, it was determined that the actions taken by Inmate Friedland, Darrell #336916 while being transported by the Judicial Marshals from Rockville Court (JD19) to the MacDougall-Walker Correctional Institution on Wednesday, April 16, 2008 at approximately 3:05 PM did constitute an attempted escape.  Additionally, based on the fact that Connecticut State Police involvement was necessary and because Friedland is expected to be charged by C.S.P. on the charge of Attempted Escape, this disciplinary report is warranted.

(*See* May 14, 2008 Disciplinary Process Summary Report, Ex 4 to Blais Aff. [Doc. # 20-8].)

Plaintiff complains that the disciplinary report did not include specific facts as to what conduct constituted an attempted escape.  The report includes the specific location, date, and time period during which the alleged attempted escape occurred, April 16, 2008 at approximately 3:05 P.M. in the transportation van on the way back from state court to MacDougall-Walker.  The Court concludes that the lack of details as to the specific actions taken by Friedland in the van at approximately 3:05 P.M. does not render the report deficient.

---

[7]  Escape is defined in the State of Connecticut Administrative Directive 9.5 as: "Leaving a correctional facility without authorization; leaving escorted custody without permission; exceeding assigned limits of community release without permission; or failing to properly return from furlough."  (*See* April 16, 2008 Incident Report at 8.) Attempt is defined as "[c]onduct which is likely to result in an act prohibited by this Directive."  A prison official is not required to charge an inmate with the separate offense of attempt because it is "deemed to be included in the substantive offense."  The offense of attempt "shall be punishable in the same degree as if the substantive offense was committed."  (*See id.* at 7.)

During the investigation of the disciplinary report and at the hearing, Friedland's defense was that he was sitting at the end of the van, did not participate in knocking down the dividing partition and did not attempt to escape.  In addition, he claimed that the other inmates in the van could corroborate that he had not attempted to escape from the van.  Thus, the specific information as to time, date, and location and the nature of the charge provided minimally adequate notice to Friedland of the conduct at issue and enabled him to attempt to prepare his defense to the charge.  *See Kalwasinski v. Morse*, 201 F.3d 103, (2d Cir. 1999) ("discrepancy as to the precise nature of the threatened harm did not represent a failure of specificity that would impair [plaintiff's] ability to prepare his defense, especially since his defense was simply that the . . . report was a fabrication"); *Wright v. Dixon*, 409 F. Supp. 2d 210, 214 (W.D.N.Y. 2006) (although disciplinary report included misstatement as to the time of the misconduct alleged to have been committed by the plaintiff, "the report was otherwise sufficiently detailed to put the plaintiff on notice of the conduct at issue").  Therefore, Plaintiff's advance receipt of the disciplinary report was not constitutionally defective and Defendants' motion for summary judgment is granted as to this claim.

2.     *Advocate's Assistance*

Plaintiff states that a prison official assigned Defendant Kay to be his advocate to assist him in preparing for the hearing on the disciplinary report.  He contends that Defendant Kay failed to investigate the allegations against him or assist him in preparing a defense by securing witnesses to offer testimony or written statements at the hearing.

Plaintiff acknowledges that on April 21, 2008, Defendant Kay discussed the disciplinary report with him and that he informed Kay that he had not attempted to escape from the van.  Friedland avers that he asked Kay to find out the names of the inmates who were on the transportation van with him and to arrange to have them testify on his behalf in support of his claim that he had not tried to escape from the van. Friedland contends that Kay informed him that the inmates could not be transported to Northern for the hearing.  When Friedland asked Kay to obtain written statements from the inmates to be submitted at the hearing, he refused to do so.  The parties dispute whether Kay was present at the hearing.  (*See* Pl.'s Aff. ¶ 35; Otero Aff. [Doc. # 20-9] ¶ 13.)  Defendants argue that Kay adequately performed his role as Friedland's advocate.

Although an inmate is not entitled to appointed counsel at a disciplinary hearing, in certain circumstances an inmate who is illiterate, confined in a restrictive housing unit, transferred to another correctional institution or unable to grasp the complex nature of the issues, may be entitled to an assigned advocate to assist him in preparing for the hearing.  *See Wolff*, 418 U.S. at 570, *Ayers v.* Ryan, 152 F.3d 77, 80–81 (2d Cir. 1998) (citing *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988).  The assigned advocate, "act[s] as [the inmate's] surrogate in doing "what the inmate would have done were he able, but is not required "to go beyond the specific instructions of the inmate" in rendering assistance.  *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (per curiam).

Here, Plaintiff states that he was in a restrictive housing unit at the time of the hearing, was only able to ascertain the name of one of the ten other inmates who were

present on the prison van on April 16, 2008, and was unaware of the whereabouts of any of the inmates in order to secure their presence at his hearing.  He instructed Kay to either arrange to have the inmates testify or get written statements from them, but Kay refused to do so and no witnesses were present nor were any witness statements introduced at the hearing.  (*See* Pl.'s Aff. ¶¶ 27–32, 35.)  Kay's Advocate Investigation Report is unclear regarding any requests for witness statements or testimony requested by Friedland as those sections were left blank and no mention was made of witnesses in the Conclusion and Recommendation section of the report.  (*See* May 14, 2008 Disciplinary Process Summary Report at 8-9.)

Defendants contend that Kay's report suggests that Plaintiff did not ask to present witnesses at the hearing.  Since Kay has not submitted an affidavit, there is conflicting evidence as to whether Friedland asked Kay to secure witness testimony or statements to be submitted at the hearing and whether the lack of access to these statements or testimony deprived Plaintiff of the opportunity to marshal evidence and present a defense.  Thus, Defendants have not met their burden of demonstrating that there are no issues of material fact in dispute regarding the adequacy of the assistance provided to Plaintiff by Kay in preparation for the hearing, and their motion for summary judgment is therefore denied as to this procedural due process claim.

### 3.   *Written Statement of Reasons*

Plaintiff claims that Defendant Otero's Disciplinary Summary Process Report was deficient because it did not set forth the evidence that she relied on to support her finding

of Friedland's guilt on the attempted escape charge.  Defendants contend that Otero's

Summary Process Report provided a sufficient description of the evidence that she may

have relied on and her reasons for reaching her decision.

However, a review of Otero's Disciplinary Summary Process Report reflects that it

does not include or describe any specific evidence relied on or the reasons for her

disciplinary finding. Rather, the Summary Process Report simply refers generally to

"documentation submitted" in support of the decision.  It is only Defendant Otero's

affidavit that says "documentation submitted" means the Incident Report Package

prepared in connection with the disturbance that occurred on the prison van driven by

Judicial Marshals, a Medical Incident Report and a Use of Force Report.  (*See* Otero Aff.

¶ 16; *see also* May 14, 2008 Disciplinary Process Summary Report; April 16, 2008 Incident

Report, Ex. 3 to Blais Aff.)  Thus, in the absence of Otero's Affidavit, submitted in support

of Defendants' motion for summary judgment, a reasonable jury could conclude that the

Summary Report did not identify the documents that constituted the evidence Otero

relied on in reaching her decision on the disciplinary charge against Friedland.

It is well-established that a pretrial detainee has a due process right to a written

statement describing the evidence upon which a hearing officer relied in finding the

detainee guilty of a disciplinary infraction.  *See Wolff*, 418 U.S. at 564–65; *Sira v. Morton*,

380 F.3d 57, 74 (2d Cir. 2004); *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1981).  There

are limits, however, on this disclosure requirement for evidence supporting a disciplinary

decision.  The Supreme Court has held that institutional safety concerns may provide a

sufficient reason to exclude a description of certain evidence in the written statement of reasons.  *See Wolff*, 418 U.S. at 565.  If a prison official wishes to exclude details about particular evidence on which he or she relied in finding guilt for safety and security reasons, that justification must be set out in the written report documenting the basis for the disciplinary decision.  *See id.*

Defendant Otero's Summary Process Report provided no description of the evidence that she relied on to support her guilty finding and she offered no security justification for the omission.  Without either, a reasonable jury could conclude that Defendant Otero's Summary Process Report fails to meet the requirement in *Wolff* that the hearing officer provide a written statement of the evidence relied on and the reasons for her disciplinary action.  *See Davidson v. Capuano*, No. 78 CIV. 5724 (RLC), 1988 WL 68189, at *12 (S.D.N.Y. June 16, 1988) (holding that hearing officer's report that simply listed a reference to a source of information—a "Misbehavior Report"—as the evidence relied did not satisfy the requirements of *Wolff*); *Powell v. Ward*, 487 F. Supp. 917, 930 (S.D.N.Y. 1980) (finding limited statements listing only a source or sources of information related to charges were inadequate and failed to comply with *Wolff*), *modified on other grounds*, 643 F.2d 924 (2d Cir. 1980), *cert. denied*, 454 U.S. 832 (1981). The Court concludes that Plaintiff has presented a viable due process claim with respect to Otero's failure to identify the specific evidence upon which she relied in her disciplinary decision, and Defendants' motion for summary judgment is therefore denied as to this procedural due process violation.

####     4.     *Some Evidence To Support Guilty Finding*

Plaintiff argues that there was no evidence to support Defendant Otero's decision that he was guilty of attempted escape.  The Due Process Clause of the Fourteenth Amendment requires that a hearing officer's determination be supported by "some evidence."  *Superintendent v. Hill*, 473 U.S. 445, 455 (1985).  "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports'" the hearing officer's disciplinary determination.  *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)) (analyzing evidence in summary judgment record although the defendants failed to identify or describe this evidence in the disciplinary decision).

The documentation relied on by Defendant Otero in support of her guilty finding included an Incident Report.  (*See* Otero Aff. ¶ 16.)  That Report included statements from the Judicial Marshal who was driving the prison van and the Judicial Marshal who was sitting in the passenger seat.  One of the Marshals indicated that she overheard inmates in the back of the van talking about escaping, heard Plaintiff kicking the partition and observed Plaintiff walk through the broken partition to the other side of the van and then begin to kick the partition that divided the back of the van from the front of the van where she and the other Judicial Marshal were sitting.  She related that she heard Plaintiff and the other inmates say that they were trying to get through to the driver's side of the van which caused her to fear for her life.  (*See* May 14, 2008 Disciplinary Process Summary Report at 35–38.)  Thus, although the basis for Defendant Otero's decision may

not have been clear in her Summary Report, the documents upon which she avers that she relied constitute some reliable evidence to support Defendant Otero's determination that Plaintiff was guilty of attempted escape by trying to leave escorted custody without permission, and therefore Defendants' motion for summary judgment is granted as to this procedural due process claim.  *See Sira*, 380 F.3d at 82–83 (holding that the defendants were not entitled to qualified immunity with respect to the plaintiff's claim that they had not disclosed the evidence upon which they relied in their written statement of reasons, but that they were entitled to qualified immunity on the question of whether the disciplinary decision was supported by "some evidence" in the summary judgment record).

### B.    Personal Involvement of Defendant Choinski

Defendants contend that the claims against Defendant Choinski should be dismissed because he lacked personal involvement in the alleged violation of Plaintiff's due process rights in that he did no more than deny Plaintiff's appeal of Defendant Otero's guilty determination.  Plaintiff counters that the denial of his appeal constitutes sufficient personal involvement to impose supervisory liability on Defendant Choinski.

As a supervisory official, Defendant Choinski cannot be held liable under section 1983 solely for the acts of his subordinates.  *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).  Plaintiff may show supervisory liability by demonstrating one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of

the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted). In addition, Plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court found that a supervisor can be held liable only "through the official's own individual actions." *Id.* at 676. This decision arguably casts doubt on the continued viability of some of the categories for imposing supervisory liability enunciated in *Colon*. The Second Circuit, however, has not revisited the criteria for supervisory liability following *Iqbal*. *See DeJesus v. Albright*, No. 08 Civ. 5804 (DLC), 2011 WL 814838, at *6 n.4 (S.D.N.Y. Mar. 9, 2011). Because it is unclear whether *Iqbal* overrules or limits *Colon* the Court will continue to apply each of the categories for supervisory liability set forth in *Colon*.

After Defendant Otero found Plaintiff guilty of attempted escape, Plaintiff filed an appeal of the decision and the sanctions imposed by Defendant Otero. In response, Defendant Choinski engaged in an extensive review of the appeal and concluded there was sufficient evidence to support the guilty finding and that no serious due process

20

failure had occurred prior to or during the disciplinary hearing.  (*See* Appeals Decision, Ex. 5 to Blais Aff.)

The Second Circuit has held that a supervisory official in charge of a correctional facility may be personally involved in depriving an inmate of his due process rights during a hearing on a disciplinary charge if he or she affirmed the appeal of the hearing officer's decision.  *See Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (concluding that the plaintiff had "sufficiently alleged that Superintendent Smith was personally involved in depriving him of his due process right to call witnesses" at the hearing on the misbehavior report when Smith affirmed the guilty finding on appeal); *Wright v. Smith*, 21 F.3d 496, 502 (2d Cir. 1994) (concluding that Superintendent "Smith was [a] supervisory official [who], after learning of the violation through a report or appeal, . . . failed to remedy the wrong").  Furthermore, in situations where the supervisory official has actively considered the issues raised by the inmate in reviewing and responding to the appeal rather than simply rubber-stamping the underlying decision of the hearing officer, personal involvement on the part of the supervisory official has been found.  *See Molano v. Bezio*, No. 10-CV-6481L, 2012 WL 1252630, at * 5 (W.D.N.Y. Apr. 13, 2012) (holding that a supervisory official was involved in a due process violation because he considered deficiencies underlying the hearing as well as exculpatory evidence in modifying the sentence imposed by the hearing officer); *Thomas v. Calero*, 824 F. Supp. 2d 488 (S.D.N.Y. 2011) (concluding that the Director of Special Housing/Inmate Disciplinary Programs' decision to affirm the Hearing Officer's "determination of guilt with only a

modification of the penalty [was] sufficient to demonstrate involvement and could lead a trier or fact to impose liability under the second *Colon* factor").

The evidence submitted supports Plaintiff's contention that Defendant Choinski became aware of the alleged procedural due process deprivations in reviewing the written appeal of the disciplinary finding before the sanctions imposed by Defendant Otero had expired, but failed to remedy the violations. *See Rodriguez v. Selsky*, Civil Action No. 9:07-CV-0432(LEK/DEP), 2011 WL 1086001, at *6 (N.D.N.Y. Jan. 25, 2011) (prison supervisor's decision to affirm "constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated by the Second Circuit for informing the supervisory liability analysis"), *report & rec. adopted*, No. 07-CV-0432, 2011 WL 830639 (N.D.N.Y. Mar. 3, 2011); *Garcia v. Selsky*, 680 F. Supp. 2d 479, 481 (W.D.N.Y. 2010) ("[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeal[] as opposed to merely rubber-stamping the results.") (internal quotation marks and citations omitted)).

Thus, Defendant Choinski's investigation of Plaintiff's due process claims in connection with the issuance of the disciplinary report and the hearing to dispose of the disciplinary report constituted sufficient involvement under the second *Colon* factor, and Defendant's motion for summary judgment is therefore denied as to claims against

Defendant Choinski relating to his alleged failure to remedy the underlying procedural defects associated with the disciplinary hearing.

### C.     Procedural Due Process—High Security Placement

Plaintiff claims that Defendant Levesque's decision to place him on High Security Status before he had been found guilty of attempted escape violated his due process rights.  Defendant Levesque counters that because the placement on High Security Status was not punitive, and rather was as a result of legitimate safety and security concerns, Plaintiff's security designation did not violate his due process rights.

The parties do not dispute that on April 29, 2008, Warden Jeffrey McGill sent a letter to Director of Offender and Classification and Population Management Levesque recommending that Plaintiff be placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4(14) due to his conduct in kicking the partition in the transport van on April 16, 2008.  Warden Murphy determined that Friedland met the criteria for high security placement because he was an inmate who has engaged in "an instant serious escape [or] attempted serious escape." (*See* Admin. Dir. 9.4, Ex. 2 to Cruickshank Aff. [Doc. # 40-3] at 10.)  In response, on May 8, 2008, Director Levesque sent a letter to Warden McGill indicating that he concurred with the recommendation of Plaintiff's placement on High Security Status and directed Warden McGill to hold a Classification Hearing to inform Plaintiff of his designation to this status.  (*See* Levesque Letter, Ex. 2 to Milling Aff. [Doc. # 20-10].)  However, no such hearing was held, and on May 13, 2008, Counselor Suse issued Friedland a document entitled High Security

Placement, advising him that he had been placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4, and explaining the restrictions under which he would be managed during his placement on High Security Status.   (*See* High Security Placement, Ex. 3 to Milling Aff.)  Friedland signed the High Security Placement document on May 19, 2008.  Friedland states that he was confined on High Security Status until his release on parole.

### 1. *Personal Involvement of Defendant Levesque*

Defendants argue that Defendant Levesque is named only because of his role as a supervisory official within the Department of Correction, and that he lacked any personal involvement in Plaintiff's case.  However, based on the Amended Complaints and the exhibits in the record, it is clear that Defendant Levesque was directly involved in the decision to place Plaintiff on High Security Status as the Director of Inmate Classification and Population Management.  Thus, Defendants' motion for summary judgment on the ground that Defendant Levesque lacked the personal involvement necessary to establish supervisory liability is denied.

### 2. *Protected Liberty Interest—Due Process Clause*

A pretrial detainee has a liberty interest in being free from punishment "prior to an adjudication of guilt in accordance with due process of law."  *Bell*, 441 U.S. at 535. Defendant Levesque argues that Plaintiff has no protected liberty interest under the Due Process Clause of the Fourteenth Amendment because he was placed High Security Status not for punitive reasons, but rather for the legitimate governmental purpose of safety and

security as a result of his attempted escape from the prison van on April 16, 2008.  (*See* Aldi Aff. [Doc. # 40-4] ¶ 33.)  Plaintiff has presented no evidence based on which a jury could reasonably conclude that his designation to High Security Status was punitive in any way.

Connecticut Department of Correction Security Risk Coordinator Aldi avers that an inmate's placement on High Security Status permits Department of Correction staff to engage in increased supervision of an inmate who might be a threat to the security of the prison facility, staff, inmates, or the public.  (*See id.* at ¶ 13.)  There is nothing in the Administrative Directives that prohibits a prison official from designating an inmate to High Security Status prior to a disciplinary finding of guilt as to an attempted escape charge.  (*See id.* at ¶¶ 32–34.)  Plaintiff's placement on High Security Status was based on his involvement in the incident in the prison van on April 16, 2008 and was documented in the Incident Report prepared by Department of Correction officials later that day.  (*See* April 16, 2008 Incident Report.)  Although Plaintiff avers that he did not attempt to escape from the prison van, he concedes that he kicked out the partition in the van, walked over the broken partition to the other side of the van and confronted an inmate sitting there.  (*See* Pl.'s Aff. ¶¶ 16–20.)

Defendant Levesque further contends that Plaintiff's High Security Status designation was not an exaggerated response to Plaintiff's behavior, but was reasonably related to the legitimate penological objective of maintaining the safety and security of the prison staff and the public as well as monitoring and managing Plaintiff's custody.  In

light of the Department of Correction's consideration of the conversations overheard by the State Judicial Marshals who were driving the van, as well as their observations of Plaintiff's behavior, and Plaintiff's concession that he did kick out the partition in the van, the decision to place Plaintiff on High Security Status was not an unreasonable or excessive response to Plaintiff's conduct in the van.  *See Bell*, 441 U.S. at 540 n.23 (determination whether particular restriction or limitation is reasonably related to the function of pretrial confinement requires courts to remember that the implementation of such restrictive measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.")

Plaintiff has submitted no evidence to demonstrate that the decision to place him on High Security Status was done for a punitive purpose rather than for the legitimate administrative purpose of maintaining safety, security, and order in the prison. Therefore, the Court concludes that Plaintiff's designation to High Security Status did not constitute punishment, and thus the Fourteenth Amendment does not provide a protected liberty interest in his avoidance of that classification.  *See Taylor v. Comm'r New York Dep't Corrections*, 317 F. App'x 80, 82 (2d Cir. 2009) (affirming district court's determination that inmate's confinement in punitive segregation unit for approximately two months did not constitute punishment because "there was no evidence in the record demonstrating prison officials intended to punish inmate and confinement not excessive

in relation to purpose of maintaining safety"); *Covino v. Vermont Dep't of Corrections*, 933 F.2d 128, 129 (2d Cir. 1991) ("[T]he transfer of an inmate to less amendable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself."); *Adams v. Galletta*, No. 96 CIV. 3750 (JGK), 1999 WL 959368, at *4 (S.D.N.Y. Oct. 19, 1999) (concluding pretrial detainee had not been deprived of a liberty interest under the Due Process Clause of the Fourteenth Amendment because his designation as a Central Monitoring Case was due to his being an escape risk and his "subsequent housing in maximum security was not punitive").

### 3.   Liberty Interest Under State Law

The Second Circuit has held that even if a restraint or restriction placed on a pretrial detainee is not punitive, a Court must also determine whether the state by "statute or regulation prescribes mandatory procedures that . . . create a liberty interest." *Covino*, 933 F.2d at 129 (citing *Hewitt*, 459 U.S. 103). In *Hewitt*, the Supreme Court analyzed Pennsylvania laws governing placement of prisoners in administrative segregation and concluded that these laws created a liberty interest because they included "language of unmistakably mandatory character, requiring that certain procedures be employed . . . and that administrative segregation will not occur absent specified substantive predicates. . . ." identified as "the need for control" and "the threat of a serious disturbance." *Id.* at 471–72 & n.6 (internal quotation marks omitted).

Defendant Levesque neglects to engage in any examination or discussion of whether the State of Connecticut's Administrative Directives governing Classification and

27

Restrictive Housing placement include mandatory language that might be construed to require procedural due process protections prior to or after a pretrial detainee's placement on or designation to High Security Status.  Instead, without discussion, he simply concludes that Plaintiff has no liberty interest in his classification to High Security Status under state law because the Department of Correction has discretion to determine prisoner classifications.

The language in Administrative Directive 9.4 governing the imposition of restrictive conditions of confinement on inmates suggests that a hearing might be required in connection with an inmate's placement on High Security Status.  (*See* Admin. Dir. 9.4.)  Specifically, Administrative Directive 9.4(14) provides that "[a]n investigation shall be conducted by the Unit Administrator or designee to determine if an inmate may be considered for a High Security Monitoring Hearing, if such inmate meets one of the criteria listed in this section."  (*Id.*)  It requires "each [prison] facility to establish procedures to review each inmate, consistent with classification practices, to determine if an inmate shall be considered for a High Security Monitoring Hearing."  (*See id.* at 9.4(14)(A)).   Furthermore, Administrative Directive 9.4(14) includes language that suggests that High Security placement will not occur unless an inmate meets certain listed criteria.  (*See* Admin. Dir. 9.4.)  This language could be construed to require specific substantive predicates prior to an inmate's placement on High Security Status. Additionally, the August 8, 2008 letter from Defendant Levesque to Warden Jeffrey McGill confirms that Defendant Leveque understood that a hearing was required or

would be held in connection with the recommendation that Plaintiff be placed on High Security Status.  (*See* Levesque Letter.)  Thus, an examination of the evidence presented by Defendants reflects that there are issues of fact as to whether Plaintiff satisfied the criteria to be entitled to a High Security Monitoring Hearing pursuant to Administrative Directive 9.4, such that he had a protected liberty interest under state law to such a hearing.

### 4. *Process to Which Plaintiff Was Entitled*

Assuming that Plaintiff has demonstrated a liberty interest in his security status designation, Plaintiff was entitled to at least "the minimal procedures outlined in *Hewitt*." *Benjamin*, 264 F.3d at 190.  In *Hewitt*, the Supreme Court held that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation," and the "proceeding must occur within a reasonable time following the inmate's transfer."  *Id.* at 476 & n.8.

Defendant Levesque has not addressed whether Plaintiff's receipt of written notice of his placement on High Security Status met the requirements of *Hewitt*.  After Defendant Levesque approved Plaintiff's designation to High Security Status on May 9, 2008, Counselor Supervisor Mark R. Suse prepared a notice of High Security Placement dated March 13, 2008.  On May 19, 2008, Plaintiff signed the notice indicating that he had been informed of his placement on High Security Status.  The notice advised Plaintiff that he had been placed on High Security Status pursuant to Administrative Directive 9.4 and

described the restrictions that would accompany the placement.  The notice did not include the basis for the designation.  Thus, although the notice was provided to Plaintiff within a reasonable time after Defendant Levesque's decision to place him on High Security Status, it did not include the charges against him or the basis for his designation to High Security Status.  Furthermore, there is no evidence to suggest that the mere delivery of the notice to Plaintiff by Counselor Suse met the requirement that Plaintiff be given an opportunity to present his views to either Defendant Levesque or Warden McGill as to the decision to place him on High Security Status.  Based on the modicum of evidence presented by parties, Defendant Levesque has failed to show that he is entitled to judgment as a matter of law on the claim relating to the process afforded to Plaintiff in connection with his placement on High Security Status in May 2008.  Accordingly, Defendants' motion for summary judgment is denied with respect to this claim.

### D.    Injunctive Relief

Plaintiff requests injunctive relief in the form of an order that Defendants remove him from High Security Status and expunge the disciplinary report charging him with attempted escape.  Defendants argue that these requests are now moot because Plaintiff has been discharged from the Department of Correction.

The Second Circuit has held that an inmate's request for injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976). *See also Martin-*

*Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."). Other courts concur with this result. *See, e.g.*, *McAlpine v. Thompson*, 187 F.3d 1213, 1215 (10th Cir. 1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement).

Plaintiff has informed the Court that he is no longer incarcerated within the Connecticut Department of Correction.  In his response to Defendants' argument that the injunctive relief is moot, Plaintiff indicated that after his release on special parole from his Connecticut sentence on September 28, 2012, he was taken into custody by Massachusetts Department of Corrections and is confined in a Massachusetts Correctional Institution in South Walpole, Massachusetts.  He acknowledged that the term of special parole from the Connecticut sentence expired on September 15, 2013.  Thus, at this point, Plaintiff is currently no longer on parole or within the custody of the Connecticut Department of Correction.  As such, he is no longer on High Security Status.  The Court therefore concludes that Plaintiff's request for injunctive relief pertaining to his removal from High Security Status by Connecticut prison officials is moot.

With regard to Plaintiff's request that the disciplinary report for attempted escape be expunged, the Court concludes that this request is not moot.  If a jury were to determine that Defendants denied Plaintiff due process in connection with the issuance of the disciplinary report, the Court might award relief in the form of expungement of the

report.   Therefore, Defendants' motion for summary judgment is granted as to the request for injunctive relief regarding Plaintiff's removal from High Security Status and denied as to the request for injunctive relief pertaining to the expungement of the disciplinary report.

### E.      Qualified Immunity

Defendants argue that they are entitled to qualified immunity on all of Plaintiff's claims.   Defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial.  *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled to qualified immunity, a court considers whether (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct.  *See Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2080 (2011) (citation omitted).   A negative answer to either question means that immunity from monetary damages claims is appropriate.  *Pearson*, 555 U.S. at 236. The Supreme Court has held that district courts have the discretion to choose which of the two prongs

of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to be decided.  *See id.* at 236.

Under the second prong, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  "A broad general proposition" does not constitute a clearly established right.  *See Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2094 (2012).  Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

In support of their qualified immunity argument, Defendants state that:

> [i]n the claim at hand, the most expeditious means of disposing this lawsuit should be utilized and that would be to address whether the defendant violated the plaintiff's constitutional rights, pursuant to the Due Process Clause of the Fourteenth Amendment.  It is clear from the evidence that this is not the case as to these defendants.

Defs.' Mem. Supp. [Doc. # 40] at 25–26.  Defendants offer no further discussion.  It is apparent that Defendants are arguing that they are entitled to qualified immunity under the first prong of the standard.

In summary, the Court has determined that there are outstanding issues of material fact with regard to Plaintiff's due process claims relating to the disciplinary

hearing and the decision to place Plaintiff on High Security Status that preclude summary judgment. Specifically, there are material facts in dispute as to the adequacy of the assistance provided to Plaintiff by Defendant Kay in preparation for the disciplinary hearing, including securing witness testimony or witness statements and whether Defendant Otero's Summary Process Report provided an adequate written statement of the evidence relied on and the reasons for the disciplinary action.

With regard to the claim that Defendant Levesque denied Plaintiff procedural due process in connection with his placement on High Security Status, the Court has concluded that there are issues of material fact as to whether a liberty interest was created under the circumstances of this case by the language of the Administrative Directives governing an inmate's placement on High Security Status. Furthermore, the evidence presented by Defendant Levesque precludes a finding that he is entitled to judgment as a matter of law on the issue of whether Plaintiff received all the process that he was due in connection with Plaintiff's placement on High Security Status. Thus, Defendants are not entitled to summary judgment on the first prong of the qualified immunity standard.

Although summary judgment might still be appropriate if Defendants could prove that the constitutional rights in questions were not "clearly established" at the time of the violations, Defendants do not address the second prong of the qualified immunity standard. At the time of the disciplinary hearing and Plaintiff's placement on High Security Status, it was well established under *Bell* that a pretrial detainee could not be punished prior to being sentenced for a criminal conviction, that the requirements in

*Wolff* applied to the disciplinary hearing of a pretrial detainee involving punitive sanctions or restraints, and that a liberty interest could be created under state law that would require the procedural due process protections set forth in *Hewitt* before a pretrial detainee could be designated to a restrictive classification status for administrative purposes. *See Wolff*, 418 U.S. 539; *Bell*, 441 U.S. 520; *Hewitt*, 459 U.S. 469; *Benjamin*, 264 F.3d 175; *Covino*, 933 F.2d 128. Because Defendants do not offer any argument with regard to the second prong of the qualified immunity standard, the Court will not consider the issue any further at this time.

Disputed issues of material fact preclude a finding that Plaintiff's procedural due process rights were not violated such that the Defendants are entitled to judgment as a matter of law. Furthermore, Defendants have not met their burden of demonstrating that Plaintiff's rights to due process in connection with the disciplinary report and placement on High Security Status were not clearly established such that a reasonable officer would not have known that his conduct was unlawful. Accordingly, Defendants' motion for summary judgment on the ground that they are entitled to qualified immunity is denied on this record.

## III.    Conclusion

Defendants' Amended Motion [Doc. # 39] for Summary Judgment is GRANTED as to Plaintiff's request for injunctive relief removing him from High Security Status; as to Plaintiff's claim that he received insufficient notice of the disciplinary charge against him; and as to Plaintiff's claim that there was no evidence to support the guilty finding on the

escape charge; and is DENIED as to the due process claims relating to Defendant Levesque's decision to place Plaintiff on High Security status; the adequacy of Defendant Kay's assistance in preparing Plaintiff for the hearing on the escape charge; Defendant Otero's failure to identify or describe the evidence relied on to support the guilty finding as to the escape charge; and Defendant Choinski's decision not to remedy the due process violations of Defendants Kay and Otero after becoming aware of them on appeal.

As discussed in Note six on page six, Defendants failed to address Plaintiff's claim that Defendants lacked the authority to discipline him because he was not in the custody of the Department of Correction at the time of his alleged escape.  Therefore, this claim also will be included in the trial of this case.

This case is now ready for trial.  It will be administratively closed to permit the process for appointment of pro bono counsel for trial to proceed.  This case will be reopened ten days from the date of pro bono counsel's appearance, at which time an expeditious trial schedule will be set.


IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 25th day of March, 2014.